Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
Julie D. Dyas, Esq.
**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York 10022
Phone: (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net; rraicht@halperinlaw.net
jdyas@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

**CONTEST PROMOTIONS-NY LLC,**

         Debtor.
-------------------------------------------------------------x

Chapter 11

Case No. 11-14652 (JMP)

**MOTION FOR EMERGENCY, INTERIM AND
PERMANENT USE OF CASH COLLATERAL
PURSUANT TO SECTIONS 105(a), 361, 362 AND 363 OF
THE BANKRUPTCY CODE AND RULE 4001(b) OF THE
<u>FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>**

TO THE HONORABLE UNITED STATES
BANKRUPTCY JUDGE IN THIS PROCEEDING:

    Contest Promotions-NY LLC, the debtor and debtor-in-possession ("<u>Contest Promotions</u>" or the "<u>Debtor</u>"), by its proposed counsel, Halperin Battaglia Raicht, LLP, hereby moves the Court for entry of an Order, pursuant to sections 105(a), 361, 362 and 363 of title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>") and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"):

    (a) Authorizing, on an emergency basis, pursuant to the terms of an emergency order ("<u>Emergency Order</u>"), immediate use, in the ordinary course of business, of any and all income, receivables, proceeds received from or on account of its pre-petition or post-petition business operations, and all other cash equivalents constituting Cash Collateral, within the meaning of section

363(a) of the Bankruptcy Code, including without limitation, proceeds, products, offspring, rents, or profits of such property, pending the interim hearing on this matter to avoid immediate irreparable harm;

(b) Scheduling, pursuant to Bankruptcy Rule 4001(b), an interim hearing (the "Interim Hearing") on the motion ("Motion") for this Court to consider entry of an interim order in substantially the form of the Interim Order (the "Interim Order"), authorizing the Debtor to utilize Cash Collateral;

(c) Scheduling, pursuant to Bankruptcy Rule 4001(b), a final hearing (the "Final Hearing") on the Motion for this Court to consider entry of a final order in substantially the form of the Interim Order (the "Final Order", and together with the Interim Order, the "Cash Collateral Orders"), authorizing the Debtor to utilize Cash Collateral;

(d) Granting adequate protection to RJPG-2011 LLC (the "Lender") as may be appropriate under the circumstances of this case; and

(e) Granting such related relief as this Court may deem just and proper.

For purposes of this Motion and unless otherwise indicated, the above-referenced cash equivalents are referred to as "Cash Collateral." Additional facts and circumstances supporting this Motion are set forth in, and incorporated herein by reference to, the Affidavit of Gary Shafner, sworn to on October 3, 2011. Capitalized terms not defined in this Motion shall have the meanings ascribed to them in the Interim Order, annexed as **Exhibit A** hereto. In support of this Motion, the Debtor respectfully represents:

**PRELIMINARY STATEMENT**

1. By this Motion, the Debtor seeks authority to use of Cash Collateral to finance its operations during the pendency of this Chapter 11 case. As discussed herein, the Lender acquired, by assignment, a $3 million secured loan facility provided to the Debtor by Manufacturers and Traders Trust Company ("M&T Bank"), and therefore holds the M&T Bank secured loan facility as its successor in interests. The holders of the membership interests in the Lender consist of certain principals of the Debtor.

2. As of the commencement of the Chapter 11 case, there is approximately $2 million owed to the Lender. Its claim is secured by accounts receivable of approximately $2.2 million and other assets with an undetermined. It is submitted that the Lender's claim against the Debtor is fully secured. The Lender does not oppose the relief requested herein.

3. In consideration of the use of Cash Collateral, the Debtor submits that the grant of a Replacement Lien (defined below) in the Debtor's post-petition assets as well as an adequate protection claim, together with certain related relief, including Adequate Protection Payments (defined below) described in more detail in the Budget (defined below), constitutes adequate protection of the Lender's claim. The Debtor submits that continuation of its business will further serve to protect and preserve the collateral of the Lender.

4. The Debtor requires use of Cash Collateral. Absent the immediate entry of the proposed order, the Debtor will be unable to conduct its business. Without immediate use of Cash Collateral, the Debtor will not be able to meet payroll, pay utility charges and fulfill obligations in connection with the continued operation of the Debtor's business, and hence, will be unable to operate on a day-to-day basis. Accordingly, the need for the use of Cash Collateral and the provision of adequate protection to the extent required in favor of the secured creditor is adequately demonstrated.

5. For all of the foregoing reasons, and for those that follow, the Debtor respectfully requests that the Motion be granted in its entirety.

## **JURISDICTION**

6. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §1334. This Motion is a core proceeding within the meaning of 28 U.S.C. §157(b)(2). Venue of the Chapter 11 case and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and

1409. The statutory predicates for the relief sought herein are sections 105(a), 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001.

## BACKGROUND

7. On October 3, 2011, (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") and has continued in the management of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

8. No creditors' committee or trustee has been appointed in this case.

9. Contest Promotions was formed in 2009. It is an affiliate of National Promotions Associates, LLC ("NPA"), which commenced operations in 1999 and subsequently assigned all of its rights, title and interests to Contest Promotions. Contest Promotions operates under the direction of Gary Shafner, Peter Zackery, and Rick Del Mastro, as its managers and members, and Michael Montgomery as its President.

10. Contest Promotions is a company that develops and manages sweepstakes for small, locally-oriented, diverse businesses in order to attract customers and drive foot traffic into their locations. The sweepstakes are financed through payments, in which the businesses share, from companies whose products are featured as part of the sweepstakes. The products include any number of items, such as motion pictures, music, entertainment devices or food products. Participants win prizes by entering a business and filling out a form. The prize package may include items available inside the business where the sweepstakes is held. No purchase is necessary; entry into the sweepstakes is free; and the businesses are serviced by Contest Promotions' staff on a weekly basis to ensure the availability of entry forms, confirm a visually pleasing presentation of the offering, and answer any questions workers, owners,

managers or customers might have. From the businesses' view, the sweepstakes draw persons into the locations, and the increased traffic results in an increase in revenue for the business and establishes goodwill with the businesses' customers and the neighborhood in which these businesses operate.

11. The Debtor's services include providing an exterior sign promoting the business and the sweepstakes in large, bold lettering. The sign typically includes the name of the business, the address of and other information about the business, arrows directing passers-by into the business, a depiction of the products featured in the sweepstakes, and a prominent announcement directing the viewer to enter the business, with language such as "Come Inside For A Chance To Win." By enabling small, locally-owned businesses to offer a sweepstakes on their premises, the Debtor enables them to compete with promotional campaigns often associated with larger big-box chains with massive budgets. This helps level the playing field between them and their nationally franchised counterparts.

12. The sign at each establishment directs attention to the business activities at the premises, including by highlighting the sweepstakes promotions offered inside. The signs are at street level and are less than 200 square feet. As installed and utilized with the sweepstakes, the signs are a lawful "accessory use" under the applicable zoning provisions for the premises. Contest Promotions carefully designs its sign panels to comply with the various sign laws and regulations enacted in the last 10 years to reduce illegal billboards. For example, the City of New York (the "City") enacted Local Law 14 (the "Arterial Highway Billboard Law") in 2001 to control the encroachment of billboards placed on private property in areas near the City's arterial highways and larger public parks. The Arterial Highway Billboard Law declared that certain signs "with a surface area greater than 200 square feet" are a public

nuisance; it expressly exempted signs under 200 square feet. The City later enacted Local Law 31, which amended the Arterial Highway Billboard Law but kept the exemption for signs under 200 square feet.

13. Contest Promotions' financial difficulties are a direct result of concerted and systematic efforts by the City, acting through the New York City Department of Buildings (the "DOB"), to put this company and others like it out of business, despite the fact that the New York Supreme Court has confirmed that signs associated with the company's business model are lawful "accessory signs." Specifically, with respect to Contest Promotions, the DOB has taken the position that the Debtor's postings of signage at the various establishments violate the City's zoning regulations. The DOB continues to maintain this position despite that Contest Promotions' signs are clearly permitted by the plain language of the applicable statutes and regulations - - a conclusion reached by the Honorable Eileen A. Rakower in a decision involving the Debtor's ongoing disputes with the DOB (as discussed below). The DOB has ignored Justice Rakower's ruling and has continued its campaign against Contest Promotions. To that end, the DOB has levied fines in excess of $1,000,000 – sometimes hitting the same location ten and twelve times with fines as high as $120,000 – against Contest Promotions and a number of property owners with whom the Debtor has agreements to provide sweepstakes and to post related accessory signage. Many, if not all, of those property owners, in turn, have asserted, or are likely to assert, claims for indemnification against Contest Promotions arising from the imposition of fines by the DOB.

14. Contest Promotions has endeavored to resolve issues concerning the fines and the conduct of its business with the DOB on a consensual basis. In early to mid-2010, the Debtor met with the representatives of the DOB on several occasions seeking a determination

that signs associated with its business model were permissible accessory signs. The DOB, however, issued a determination that the signs are "advertising signs," and the imposition of fines by the DOB and the looming threat of future fines continued unabated.

15. Thereafter, the Debtor successfully sought redress in the courts of New York. In September 2010, Contest Promotions initiated a proceeding in the New York County Supreme Court against the DOB, the City and others seeking a temporary restraining order and a declaration (a) that the signs associated with Contest Promotions' business model meet the definition of an "accessory use" and, therefore, qualify as permissible signs under § 12-10 of the New York City Zoning Resolution, (b) that the DOB's enforcement regime violates the free-speech guarantees of the United States and New York constitutions, and (c) enjoining the DOB and the other respondents from classifying or fining any of the signs associated with Contest Promotions as advertising signs, including prohibiting them from denying permit applications for such signs where the applications demonstrate conformance to the underlying zoning regulations for accessory signs.

16. The New York State Supreme Court reviewed submissions filed on behalf of the parties and heard argument on the merits of the Debtor's application. Thereafter, by order dated October 15, 2010 and a judgment dated December 10, 2010 and entered January 12, 2011, the Honorable Eileen A. Rakower ruled in favor of Contest Promotions. On September 6, 2011, the City filed appeal papers from the state court decision. The matter is scheduled to be heard before the New York State Appellate Division for the First Department in November 2011 (the "Appeal").

17. Following the October 2010 decision of the state court and continuing to date, the DOB has moved at a glacial pace on sign permit applications while it simultaneously

has moved with lightning speed in striking Contest Promotions (and the business and property owners that partner with it) with crippling fines over and over again. The DOB has acted as if Justice Rakower's ruling in favor of Contest Promotions does not apply - - continuing to treat signs as "advertising signs" even though they exactly match the model that the court considered and upheld as permissible "accessory signs." The DOB and the City have tried to destroy Contest Promotions by holding up permit applications and issuing fines to Contest Promotions and to the property owners who are partners in - - and benefit significantly from - - its sweepstakes activities.

18. Contest Promotions has had to incur substantial legal expenses in seeking and obtaining relief from the New York Supreme Court (*i.e.*, Justice Rakower's ruling), defending that ruling on appeal, and appealing and bonding various individual fines within the exacting deadlines and procedures of the applicable City administrative agencies. Contest Promotions has lost money in its operations because it has had to deal with these huge legal expenses, pay fines, and indemnify property owners. These and other challenges caused Contest Promotions to seek protection under Chapter 11.

## THE LENDER'S INTEREST IN CASH COLLATERAL

19. In December 2009, NPA, an affiliate of the Debtor, entered into a loan and obtained other financial accommodations from M&T Bank to and for the benefit of itself and the Debtor. The obligations to M&T Bank were evidenced by, among other things, a Credit Agreement, dated as December 23, 2009, a $3 million term note and a general security agreement (collectively, the "Pre-Petition Loan Agreement"). Repayment under the Pre-Petition Loan Agreement was secured by substantially all of the assets of NPA, including <u>inter alia</u>, accounts, chattel paper, investment property, deposit accounts, documents, goods, equipment, general intangibles (including

trademarks, service marks, trade names, patents, copyrights, licenses and franchises), instruments, inventory, money, letter of credit rights, causes of action (including tort claims) and other personal property and all proceeds and products of the foregoing. Pursuant to an Assumption Agreement between the Contest Promotions, NPA and M&T Bank, dated February 3, 2011, the Debtor assumed the obligations under the Pre-Petition Loan Agreement and granted liens in its assets to secure the obligations thereunder (collectively, the "Pre-Petition Collateral").

20. Thereafter, RJPG-2011 LLC (the "Lender") acquired, by assignment, the Pre-Petition Loan Agreement from M&T. Pursuant to the foregoing assignment, the Lender acquired all right, title and interest in and to M&T's rights under the Pre-Petition Loan Agreement

21. The Lender has asserted a secured claim against the Debtor in the amount of $2 million, exclusive of certain interest, fees and charges (collectively the "Pre-Petition Indebtedness"). All cash in the Debtor's possession or in which the Debtor has an interest on and after the Petition Date, together with all proceeds thereof, constitutes Cash Collateral in which the Lender has an interest within the meaning of section 363(a) of the Bankruptcy Code.

**RELIEF REQUESTED**

22. By this Motion, the Debtor seeks entry of an order, *inter alia*, (a) authorizing the use of Cash Collateral on an emergency, interim and then final basis; (b) granting adequate protection of the Lender's interests to the extent of any diminution in the value of the Pre-Petition Collateral, whether from the use of the Cash Collateral, the use, sale, lease, depreciation or other decline in value of the Pre-Petition Collateral, or as a result of the imposition of the automatic stay under section 362(a) of the Bankruptcy Code; (c) scheduling, pursuant to Bankruptcy Rule 4001 the Interim Hearing on the Motion to

consider the entry of the Interim Order authorizing the Debtor to use Cash Collateral on an interim basis; and (d) scheduling the Final Hearing on the Motion.

**Summary of Proposed Terms and Conditions for Use of Cash Collateral**

23. In accordance with Bankruptcy Rule 4001, the following sets forth a summary of the material terms of the Interim Order:

- *Entity With an Interest in Cash Collateral.* RJPG-2011 LLC.

- *Purpose of Proposed Use of Cash Collateral.* The Interim Order authorizes the Debtor to use Cash Collateral for general corporate purposes, and costs and expenses related to the Chapter 11 case subject to and solely for the purposes identified in, and to the extent allowed by, the Budget (as defined herein). (**Interim Order ¶ 3**).

- *Duration of Use.* From the Petition Date through the occurrence of a Termination Event, as described herein. (**Interim Order ¶ 15**).

- *Budget.* The Debtor is permitted to use Cash Collateral to pay costs and expenses of operating the Debtor's business and conducting the Chapter 11 case as set forth in a budget (the "Budget"). (**Interim Order ¶ 7**).

- *Adequate Protection of the Pre-Petition Lender.* As adequate protection, the Debtor proposes to grant to the Lender the following:

    o Replacement Liens. The Lender will be granted valid and perfected replacement security interests in, and liens (the "Replacement Liens") on all assets and other property acquired and/or created by the Debtor from and after the Petition Date (the "Post-Petition Collateral"). The Post-Petition Collateral will not include claims and causes of action under §§ 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or the proceeds thereof (the "Avoidance Actions"). The Replacement Liens will be expressly subject and subordinate to the Carve-Out (as defined herein). Subject to the Carve-Out, the Replacement Liens shall be (a) a first priority perfected lien on all of the Post-Petition Collateral that is not otherwise encumbered by a validly perfected, non-avoidable security interest or lien as of the Petition Date, (b) a first priority, senior and perfected lien on (i) that portion of the Post-Petition Collateral that comprises the Pre-Petition Collateral and is not subject to a validly perfected lien or security interest with priority over the Lender's liens on the Pre-Petition Collateral as of the Petition Date and (ii) Post-Petition Collateral subject to a lien that is junior to the liens securing the Pre-Petition Indebtedness, and (c) a second priority, junior perfected lien on all Post-Petition Collateral that is subject to a validly perfected lien with priority over the Lender's liens as of the Petition Date (**Interim Order ¶ 8**);

- Adequate Protection Claim. As further adequate protection, the Lender will be granted an allowed administrative expense claim, with priority over all administrative expense claims and unsecured claims against the Debtor, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 (the "Adequate Protection Claim"), provided, however, that the Adequate Protection Claim shall be subject to the Carve-Out and shall not extend to any Avoidance Actions. (**Interim Order ¶ 9**);

- Adequate Protection Payments. Pursuant to section 361(1) of the Bankruptcy Code, as adequate protection for the Debtor's use or sale of the Pre-Petition Collateral, the Debtor shall be required to pay the Lender monthly interest in the amount of 6.25% on outstanding principal (equal to $10,402.00 provided principal is unchanged) from and after the Petition Date arising under, and in accordance with, the Pre-Petition Loan Agreement pending the Debtor's continued use of Cash Collateral hereunder (the "Adequate Protection Payments") (**Interim Order ¶ 10**); and

- Reporting Requirements. The Debtor shall furnish to the Lender all financial information and reports prepared by the Debtor, as required by the Bankruptcy Court or by the Operating Guidelines and Reporting Requirements of the U. S. Trustee's Office (**Interim Order ¶ 13**).

- *Carve-Out*. The Replacement Liens and Adequate Protection Claim shall be subject and subordinate only to a carve out equal to (a) amounts payable pursuant to 28 U.S.C. §1930(a)(6) and 31 U.S.C. § 3717; (b) fees and expenses of attorneys, accountants, and other professionals retained in the Chapter 11 case by the Debtor in the amounts set forth in the Budget to the extent allowed by the Bankruptcy Court, provided, however, in the event of an occurrence of an Termination Event (as defined herein) and from and after the date of such Termination Event, the fees and expenses of Debtor's professionals shall not exceed $125,000, to the extent allowed by the Bankruptcy Court; (c) fees and expenses of attorneys, accountants, and other professionals retained in the Chapter 11 case by any Committee (as defined herein) appointed in this case in an amount not to exceed $25,000 to the extent allowed by the Bankruptcy Court; and (d) reasonable fees and expenses of any Chapter 7 trustee, allowable pursuant to section 726(b) of the Bankruptcy Code in an amount not to exceed $20,000 (collectively, subsections (a), (b) (c) and (d) hereof, the "Carve-Out"). The Carve-Out may not be used in connection with the assertion and/or prosecution of a Challenge Claim (as defined in the Interim Order) against the Lender, provided, however, that the Carve-Out funds allocable to the Committee may be used to undertake an investigation of the facts relating to a potential Challenge Claim with regard to the prepetition liens and claims of the Lender, in accordance with Local Rule 4001-2(f) of the Bankruptcy Court. (**Interim Order ¶ 14).**

- *Termination of Use of Cash Collateral*. Use of Cash Collateral shall terminate upon the date of the occurrence of or, in some instances, after 5 days' notice of, certain events of

default (a "Termination Event").  Automatic Termination Events include: (a) the date that is 180 days following the Petition Date, subject to further extension between the Debtor and the Lender; (b) the date that is 45 days after the Petition Date if the Final Order has not been entered by such date; and (c) the date that the Interim Order or the Final Order (when applicable) ceases to be in full force and effect or is stayed in any respect.  Termination Events subject to a 5-day notice period include: (a) the Debtor's failing to make a payment when required by the Interim Order; (b) the Debtor's making disbursements in excess of those set forth in the Budget and the permitted deviations allowable under the Interim Order; (c) the Debtor's failing to comply with the reporting requirements under the Interim Order; (d) the then applicable Budget expiring without a new proposed Budget having been agreed to by the Lender; and (e) the filing of a Challenge Claim. (**Interim Order ¶ 15**).

- *Remedies upon Termination*. On the occurrence of a Termination Event, (a) the Debtor's right to use the Cash Collateral shall terminate automatically and (b) any unpaid Adequate Protection Payments shall automatically become immediately due and payable, (c) upon 7 business days' written notice to the Debtor (with a copy to counsel for the Committee and the Office of the United States Trustee), the Lender may seek an Order of the Court authorizing the Lender to (i) setoff amounts in any account of the Debtor maintained with the Lender and (ii) exercise the rights and remedies available under the Interim Order or applicable law, including foreclosing upon and selling all or a portion of the Pre-Petition Collateral or Post-Petition Collateral.  (**Interim Order ¶ 16**).

## Basis for Relief

**A.**  **The Proposed Use of Cash Collateral Is Appropriate and Should be Authorized**

24. In order to continue the operation, the Debtor requires use of Cash Collateral.  It is essential to the continued operation of the Debtor that it obtain authority to use Cash Collateral to fund payroll and other operating needs, including the costs of administration of this Chapter 11 case.

25. Currently, the Debtor has no available cash or assets that are not alleged to be subject to the Lender's liens and security interests.  Authorization to utilize Cash Collateral will provide the Debtor with the liquidity necessary to operate its business and to pay the wages, salaries, rent, utilities, and other expenses associated with running the Debtor's business.  Without authorization to use Cash Collateral, the Debtor's business operations will be terminated because the Debtor will be unable to obtain the services or employ the personnel necessary to

operate its business and will not be able to pay necessary operating expenses. Moreover, the Debtor must be able to provide assurance to its customers and vendors that it will be able to pay bills in the ordinary course for all post-petition products and services. Thus, access to Cash Collateral is crucial to the Debtor's ability to avoid immediate and irreparable harm to its estate, creditors, and ongoing business.

26. Section 363(c)(2) of the Bankruptcy Code permits the Court to authorize the Debtor to use Cash Collateral with or without the consent of a secured party with an interest therein. See 11 U.S.C. § 363(c)(2)(B). Specifically, this section of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of Cash Collateral and provides, in pertinent part, that:

> [t]he trustee [or debtor in possession] may not use, sell, or lease cash collateral.., unless--(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).[1] This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

27. The Debtor respectfully submits that the proposed immediate use of Cash

---

[1] Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.]

11 U.S.C. § 363(a).

Collateral is necessary to preserve its assets and property (including the Pre-Petition Collateral) and to maintain the operation of its business during the Chapter 11 case, and will avoid immediate and irreparable harm to the Debtor's estate and creditors, including the Lender. As of the Petition Date, absent use of Cash Collateral, the Debtor is without a source of funding, and is thus facing an immediate liquidity crisis. Given such exigent circumstances, it is essential that the Debtor obtain immediate post-petition authority to use Cash Collateral.

28. Annexed as **Exhibit B** hereto is the Budget, which provides a detailed list of the various categories of expenses that the Debtor seeks authorization to pay with cash on hand as of the Petition Date and the proceeds of Cash Collateral. The Debtor request authorization to use Cash Collateral during the period from the Petition Date through September, 2012 (subject to further court-approved extensions of such period) (the "Cash Collateral Period") to pay those actual, necessary ordinary course operating expenses ("Permitted Expenditures") set forth in the Budget.

29. In order to avoid immediate and irreparable harm to the Debtor pending the Final Hearing, the Debtor asks the Court to allow it immediately to utilize the Cash Collateral on the terms and conditions set forth herein and in accordance with the Budget. The Debtor's continued operations, which will be made possible by the use of Cash Collateral requested, will also preserve the value of the Cash Collateral itself.

30. As an ongoing business, the continued operation of the business should result in a higher rate of collection of outstanding accounts receivables than that which could be expected in a liquidating case. This will further maximize the value of the Cash Collateral.

## B. The Proposed Adequate Protection Is Appropriate

31. In considering whether to authorize use of Cash Collateral, a court generally must find that the interests of the holder of the secured claim are adequately protected. See 11 U.S.C. § 363(e). Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property.., proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

32. The means by which adequate protection is provided are specified in section 361 of the Bankruptcy Code. Examples of adequate protection include, but are not limited to: (1) "periodic cash payments" to the extent that such use "results in a decrease in value of such entity's interest in such property;" (2) "additional or replacement lien[s] to the extent that the use [of cash collateral] will cause a decrease in the value of such entity's interest in such property;" and (3) "granting such other relief.., as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. Bankruptcy courts have broad flexibility under section 361 in deciding what constitutes adequate protection:

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor in possession will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir.

1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.").

33. The principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest. See Swedeland Dev. Group, Inc., 16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (quoting MBank Dallas N.A.v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987)); In re Cont'l Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (noting that all forms of adequate protection are designed to protect secured creditors from diminution in the value of their collateral); accord In re DeSardi, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."); In re Hollins, 185 B.R. 523,528 (Bankr. N.D. Tex. 1995) ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral ...").

34. Determination of whether a secured lender received adequate protection from a debtor requires an "analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the [d]ebtor's affairs by means of the Plan, and the [d]ebtor's performance in accordance with the Plan." In re Am. Sweeteners, Inc., No. 99-19471, 2000 WL 1010582 at *3-4 (Bankr. E.D. Pa. July 14, 2000).

35. Nevertheless, the "Court is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." In re Heatron, Inc., 6 B.R. 493,496 (Bankr. W.D. Mo. 1980). The interest to be protected by virtue of the adequate protection

requirement is the lesser of the amount of the debt or the value of assets securing the debt as of the Petition Date. See Bankers Life Ins. Trust v. Alvucan Interstate Corp. (In re Alvucan Interstate Corp.), 12 B.R. 803, 808 (Bankr. D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien.").

36. The Debtor respectfully submits that the adequate protection contemplated herein and in the Interim Order is reasonable and appropriate under the circumstances and should be approved. As discussed above and as described in the Interim Order, and subject to the terms and limitations set forth in the Interim Order, the Debtor proposes that the Lender will be granted Replacement Liens on the Post-Petition Collateral and an Adequate Protection Claim. It is commonplace for prepetition secured lenders to be granted replacement liens and superpriority claims. See, e.g., O'Connor, 808 F.2d at 1396-98 (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); Owens-Coming Fiberglas Corp. v. Ctr.Wholesale, Inc. (In re Ctr. Wholesale, Inc.), 759 F.2d 1440, 1450 (8th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor).

37. In addition to the Replacement Liens and the Adequate Protection Claim, the Debtor also proposes to pay the Lender, pursuant to the Interim Order, the Adequate Protection Payments described in detail above. Courts have recognized that periodic payments can constitute a component of adequate protection. See, e.g., In re Adelphia Comm. Corp., 368 B.R. 140, 279-80 (Bankr. S.D.N.Y. 2007) (permitting payment of expenses and fees to oversecured lenders as adequate protection). The periodic cash payment of current interest is clearly a generally accepted form of adequate protection. See 11 U.S.C. § 361 (1); see also In re Swedeland Dev. Group, Inc., 16 F.3d at 564 (observing that cash payments constitute a form of

adequate protection under section 361 of the Bankruptcy Code); <u>In re Crockett</u>, 3 B.R. 365,368 (Bankr. N.D. Ill. 1980) (payment of interest accepted as a form of adequate protection).

38. Finally, financial and other reporting like that required by the Interim Order is often a component of the adequate protection provided to secured creditors. <u>See</u>, e.g., <u>In re 5877 Poplar, L.P.</u>, 268 B.R. 140, 150 (Bankr. W.D. Tenn. 2001) (finding adequate protection for use of cash collateral where, among other things, the debtors agreed to provide operating reports to the lender and permit inspection of the premises upon lender's reasonable request). For the foregoing reasons, the Court should approve the adequate protection proposed herein.

### Interim Relief Is Warranted Under Bankruptcy Rule 4001(b)(2)

39. Bankruptcy Rule 4001(b)(2) permits a bankruptcy court to hold a preliminary hearing to authorize a debtor's use of cash collateral if the debtor will suffer immediate and irreparable harm if not permitted to use the cash collateral during the period prior to a final determination on a motion. In this case, the Debtor will suffer immediate and irreparable harm if they are not authorized to use Cash Collateral on an emergency basis to cover ongoing expenses as set forth in the Budget. Cash Collateral is the only source of cash available to the Debtor to pay its ongoing expenses arising in the ordinary course of business, and the Debtor will be unable to continue its operations unless the Court immediately authorizes interim use of Cash Collateral. Therefore, the Debtor requests that the Court enter the proposed Interim Order authorizing the Debtor's use of Cash Collateral in the ordinary course of its business until a final determination is made on this Motion.

### Request for a Final Hearing

40. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor respectfully requests that the Court set a date for the Final Hearing and approve the provisions for notice of the

proposed Interim Order and the objection procedures that are set forth in the proposed Interim Order.

## Notice

41. Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that it be authorized to provide notice of the Interim Hearing and Final Hearing by serving a copy of the Motion together with the Emergency Order, by facsimile transmission, hand delivery or overnight mail or courier service upon: (a) the Lender, (b) the official committee of unsecured creditors (the "Committee") (or its counsel), if one is appointed, if not, the twenty (20) largest unsecured creditors of the Debtor; (c) all known creditors who have or assert a lien against the Debtor's assets; (d) the Internal Revenue Service; (e) the City of new York; (f) all state and local taxing authorities in the locations where the Debtor conducts business; (g) the United States Attorney for the Southern District of New York; (h) the Office of the United States Trustee; and (i) all parties having filed a notice of appearance in this case (collectively, the "Notice Parties"). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## No Prior Request

35. No previous request for the relief sought in this Motion has been made to this or any other court.

(remainder of page intentionally blank)

WHEREFORE, the Debtor respectfully requests that this Court enter the Cash Collateral Orders: (a) authorizing the Debtor to use Cash Collateral, in the ordinary course of business, on an emergency basis pending the interim hearing on this Motion; (b) authorizing the Debtor to use Cash Collateral, in the ordinary course of business, on an interim basis pending the final hearing on this Motion, (c) after the Final Hearing, authorizing the Debtor to use Cash Collateral on a permanent basis, in the ordinary course of business, and (d) granting such other and further relief as is just and proper.

Dated: Los Angeles, California
October 3, 2011

                              **CONTEST PROMOTIONS-NY LLC**
                              Debtor and Debtor-in-Possession

                              By:   */s/ Gary Shafner*
                                    Gary Shafner
                                    Member and Authorized Signatory

Dated: New York, New York
October 3, 2011

**HALPERIN BATTAGLIA RAICHT, LLP**
Proposed Counsel to the Debtor
 and Debtor-in-Possession

By: */s/ Robert D. Raicht*
     Alan D. Halperin, Esq.
     Robert D. Raicht, Esq.
     Julie D. Dyas, Esq.
     555 Madison Avenue, 9th Floor
     New York, New York 10022
     Tel: (212) 765-9100
     Fax: (212)765-0964
     ahalperin@halperinlaw.net
     rraicht@halperinlaw.net
     jdyas@halperinlaw.net